2-15-0319 Nancy Saldana, Intended Executor of the Estate of Lonnie Diane Wilson, deceased. Plaintiff's Appellant, Dean Andrew M. Malawski, and Fox Valley Park District Defendant's Affidavit. Arguing on behalf of the plaintiff's appellant, Mr. Andrew P. Stevens. Arguing on behalf of the defendant's affidavit, Mr. Edward F. Douglas. Mr. Stevens, you may proceed. Thank you. Bob, may I please report? My name is Andrew Stevens, and with my colleague, Bob Bingle, and I from Corporate Demetria, we represent the Plaintiff's Appellant, Nancy Saldana, Independent Executor of Lonnie Diane Wilkinson, who deceased on September 15, 2015, as a result of the underlying facts in this case. Our contention is that the trial court erred when it granted the Park District's Motion to Dismiss, and this matter should be reversed and remanded for further proceedings. Our position is that the trial court erred in three ways. It erred when it granted the Park District's 619 Motion to Dismiss based off of the discretionary immunity provided to municipalities under Section 2201 of the Tort Immunity Act. It erred when it granted the Park District's 615 Motion based off of Plaintiff's failure to state a cause of action pursuant to 106 of the Tort Immunity Act, and it's also our contention that the trial court erred when it granted the Park District's 619 Motion to Dismiss based off of a speculative affidavit submitted by a risk manager from the Park District. I want to start with the issue of discretionary immunity, and I want to start with the Manual on Uniform Traffic Control Devices, which creates a duty and dictates the placement of signage at paths like the one at issue, where a shared-use path used by pedestrians and by bicyclists intersects with a roadway. That manual prescribes two ministerial requirements for municipalities like the Park District when implementing signage at an intersection like this. The first ministerial requirement is that the Park District was required to determine whether a restricted view of conflicting traffic existed for travelers on the trail as it approached the road. Does it create a requirement or a recommendation? It creates a requirement. This specific ministerial requirement I'm talking about is in paragraph one and two of section 9B.03. That section is the standard. Paragraph five, which is primarily what the Park District relies upon in requesting discretionary immunity from the trial court and asking for it to be affirmed here, those are guidelines. But, the two at the beginning of 9B.03 that I'm enumerating now are requirements, ministerial. The second is that the Park District was required to determine whether westbound bicyclists were required to stop at the intersection of the trail and the roadway. Now, the Park District failed to do either one of these ministerial actions. Therefore, the discretionary immunity analysis can stop there because those ministerial failures fall outside the purview of 2201. However, was the sign a condition or a cause? It was a proximate cause, as alleged in our amended complaint. Well, if she had yielded, would she still be dead? If they had placed a stop sign, it's our contention that she would have stopped at the intersection and the accident, that was a proximate cause and it may have been avoided because of that. And that's a question that should be submitted to a jury, as a matter of fact, to decide at a jury trial. You didn't answer my question, which is if she had yielded, would she still be dead? She may or she may not. I don't think that I'm in a position to resolve that factual issue. The more intricate legal issue on the discretionary immunity, beyond those two ministerial failures, is those guidelines that we were talking about. And the manual provides those as factors which should be considered when placing signage at an intersection like this. And it's those factors that the Park District relies upon. The problem with that argument, though, is that, and the reason that the trial court should be reversed, is that there's no evidence whatsoever, none, that the Park District used any of those factors or looked at any part of the manual when it implemented this yield sign at this intersection. There's no evidence that was put forward in support of the 619 motion that they made any policy determination or that they weighed any competing interests. All that is in the factual record is John Beard's testimony that he says he doesn't know when the sign was placed, he doesn't know who placed the sign, he doesn't know if the manual's factors were used for this sign, and he doesn't know what, if any decisions were made about the placement of the sign. Whose burden is it to either establish that they did or they didn't do something that you claim was either a breach or wasn't a breach? Under a 619 motion, it is the move-in's burden to establish that the immunity applies. So you're arguing this based upon the motion under 619? Yes. The Park District came forward with the 619 motion. They failed to cite any affirmative evidence that shows that they should be afforded discretionary immunity under 2201. These guidelines exist under the manual, but there needs to be a showing that there was an exercise of discretion, weighing policy decisions or weighing competing interests in the placement of this particular sign. That's required first before discretion. Discretionary immunity can be granted to the Park District, and a dismissal could be proper. Procedurally, isn't a 619 and a 615 somewhat contradictory in the sense that 615 relates to whether or not a cause of action is stated and it's presumed, and it's your responsibility to establish that, As you just pointed out, it's an affirmative matter, and therefore the burden is on the proponent. A 619 assumes, for purposes of argument, that you've stated a cause of action. So if the judge was listening to two arguments, one of which was you didn't state a cause of action, and one was you stated a cause of action, but was there anything insofar as the timeframe or the timeline that may have confused the court or the defendant or you? I don't believe so, and as an aside, I completely agree with you. I think that 619.1 makes it very difficult on trial judges to view those hybrid motions in the proper legal context, but the trial court issued a memorandum which delineates the bases for the separate rulings. The trial court granted 619 based off of the granted discretionary immunity and the affidavit of John Beardsdale for the size of the yield sign. The trial court granted 615 based off of failure to state a claim that would satisfy 106 of the Tort Immunity Act or that we didn't properly plead willful and wanton conduct. The discretionary immunity requires an affirmative showing that discretion at this intersection was actually exercised. And in conjunction with John Beard's testimony that he has no idea when or how the sign was put in place, the Park District in its brief on page 25 says that the Park District was not able to locate records regarding the installation of the yield sign, and it is not known when the yield sign was first installed. Here is where the Park District's discretionary immunity argument fails. In granting dismissal on the discretionary immunity issue, the trial court stated, and I'm going to quote this because it's important within the context of discretionary immunity. The court stated, quote, Plaintiff argues that because the Park District cannot state the particular decision-making factors that it went through in its decision to erect a yield sign some time ago, it cannot meet its burden of proving its exercise of discretion in this regard. While the court finds this to be an interesting argument, it is a stretch. There is no requirement that the Park District's decision-making methods be set forth and analyzed to prove it exercised its discretion. The proof of it exercising its discretion is the existence of the yield sign on the path at all at the time of this accident. However, it's that very type of logical leap that the Supreme Court in Monson says is a leap of faith and cannot satisfy the requirements of 2201. In Monson, we have very similar testimony where Doug Akerns in the city of Danville says we're going through this project to restore the concrete slabs on our sidewalks. A plaintiff is injured on one of those defective slabs that wasn't repaired. When asked about whether or not the city of Danville, specifically Mr. Akerns, exercised discretion in either repairing or not repairing this slab, his quote is, I believe we did consider that slab with concrete because we looked at every slab. Justice Ann Burke says that's not appropriate. That's insufficient to grant 2201 immunity. She says in her opinion in paragraph 38 of Monson that they didn't know which factors were taken into account by the city in deciding not to repair the sidewalk. More importantly, the Supreme Court did not know whether anyone even took note of a sidewalk deviation at that location or whether it was simply overlooked. This mirrors the facts that we have here. The Park District has not put forth evidence that shows that discretion was exercised at this intersection. In the sidewalk slab case, it was a crack, was it not, that caught the tire and caused the injury? It was. And wouldn't that then suggest that de minimis might apply or the de minimis rule might apply? The court, immediately after it looks at the discretionary immunity issue, then goes to the de minimis function. And Justice Ann Burke finds that the de minimis rule did not apply in Monson and reversed and remanded that matter back to the trial court. De minimis wasn't an issue in the underlying briefing here, but the discretionary immunity applies almost identically. We don't know whether or not the Park District ever took policy considerations or weighed competing interests when they placed this yield sign. And in the response, the Park District says they tried to delineate Monson from the facts here. And they say, well, in Monson, the court was concerned that they didn't know whether the city of Danville ever looked at this particular slab. And the Park District says, well, by virtue of there being a yield sign there, we looked at it at some point. But that misses the forest for the trees in what Justice Burke is saying, because this same concept applies to what we have here. Though at some point someone did pay attention to this intersection, we don't know whether they used the factors in the manual when placing the sign or whether it was the end of the day and a yield sign was the last one left in the truck. So it sounds like what you're saying, though, is that the Park District needs to be able to show a deliberative process or some kind of journal entries where it's like, okay, we had an extra yield sign and we're going to put it here, and here's why we put it here, and here's who did it on this date. That's correct. Isn't that a lot for a Park District to have to do for signs on a bicycle trail? It is not in the view of our reviewing courts, who have, with, I mean, starting with Inter-Ray Chicago flood, going to the Hanley decision in the First District, and now Monson, they're very clear that it has to be the specific defect, the specific mechanism of injury. Just saying that we have the authority or the ability to exercise our discretion is insufficient. And that's what our courts are saying, and that's very clearly what Monson says. Because there they're saying we did exercise our discretion with other slabs, but the Supreme Court says not good enough. It has to be this specific one. And it was for that reason that the Supreme Court sent that case back to the trial court and reversed the judgment. One other thing that the response of the Park District tries to do in delineating Monson is to say that it's just a sidewalk repair case and that it only applies narrowly to those. However, when the legislator enacted 2-2-1, they didn't enumerate, well, 2-2-1 applies to some types of cases and sometimes not. The Supreme Court was looking at 2-2-1 in the umbrella sense. And the First District, three months after the Monson case came out, applied the same exact reasoning that Justice Burke set forth and relied heavily on the opinion in Andrews v. Metropolitan Water Reclamation District, which is a construction supervisor. You had a fifth amended complaint, did you not? Yes. Does that mean it was a total of six or a total of four plus the fifth? The way we do it, it was the sixth. It was the sixth. Yes. Okay. What were the distinctions between the first through the sixth? And did you abandon any counts in the process from one to six? Oh, we did. We, at this point, I'm unable to go through each one and tell you how the sub-allegations changed. However, in granting the 615 motion, saying that we stated an insufficient cause of action, the Court stated that we didn't sufficiently state a cause of action that would satisfy 106 by saying that the Park District, if proven at trial, was negligent of Will Flynn 1 conduct. We specifically plead a sub-allegation, excuse me, that says that the Park District was required to analyze whether there was a restricted or unrestricted view at this intersection and that they failed to do so. And throughout the limited discovery that we have at this point, the Park District has recognized that the manual controls. And they're aware of the manual. They know that the manual dictates how signage is placed. So if that's out there, they know there's this ministerial requirement, they failed to do it in analyzing this intersection, that is sufficient for Will Flynn 1 misconduct. It's a conscious disregard for a requirement that's placed, at least in part, for the safety of pedestrians. And our reviewing courts are... Just out of curiosity, to a certain extent, playing a devil's advocate, but let's assume that at one time the shrubbery, the tapoli, or the trees that were blocking the view didn't exist there. And there was no view blockage at the time the yield sign was put up. And then some time later, the view became obscured. Does the rule or the ministerial responsibility or duty, does it have a redundancy in it that says every five years or every three years or every 18 months you have to go back and check to see that the viewing is capable of or within the confines of a yield sign vis-à-vis a stop sign? Unlike 213, there's no continuing obligation under the manual. The manual doesn't set forth that these sight lines need to be reviewed at any specific time, but discretionary immunity is clear that a ministerial action, when failed, when it's not done, cannot definitionally fall under 2201. And that's what we have here. Whether or not that sight line changed over time is a factual question that is either proper to be decided on summary judgment  It's possible that that sight line did change, but that doesn't change the requirement that the manual imposes on the Park District by doing it in the first place. Could it change as well? I think I thought I read something to the effect that seasonally it could change. Certainly. That was an argument posited by the Park District in response to our brief. And my view of that argument is that it's a tacit admission that at some point there was a restricted view here. If the view changes over time due to foliage seasonally, then the Park District is saying that we recognize that at some point there's a restricted view at this intersection. And if that's the case, then the placement, that was an analysis that they should have done on the front end and not on the back end. And it needed to be done when that sight was placed to get discretionary immunity. The third problem that we believe the trial court erred on was granting 619 dismissal based off of one of our sub-allegations because of the speculative affidavit submitted by John Beard, who stated that the sign was the appropriate dimensions, which is 18 inches by 18 inches by 18 inches. This accident took place on September 5th, 2015. So it's supposed to be a triangular sign and it's 18, 18, and 18? Correct. Okay. Then three days later, John Beard goes out to the scene, does not measure the sign, but observes and some pictures are taken. Then sometime after September 8th, 2015, he goes to what is called the cage and looks for the smallest sign in that cage, measures the smallest sign. It's 18 by 18 by 18. And he says, because the smallest sign in the cage matches what my memory is of the sign at the scene, therefore, the sign at the scene was 18 by 18 by 18. The problem with that is John Beard himself admits that it's an estimation. And it's a second district case from 1988, Schmall v. Addison, that very clearly says that an estimation is insufficient in an affidavit supporting 619 dismissal. We have a guess that the sign may have been 18 by 18 by 18. And that cannot be the basis for dismissing, as an affirmative matter, to dismiss our sub-allegation that the sign was too small. And the thing that I want to talk about is in the response, the participant says that in response to that affidavit, plaintiff submitted no counter-affidavit, and therefore the affidavit by John Beard controls. But when the affirmative matter is set forth by insufficient evidence, that affirmative matter doesn't exist. And the trial court then looks to the allegations in the complaint, which are taken as true under the 619. So we contend that the trial court should have stricken those parts of John Beard's affidavit as we requested in our response and at least maintained that allegation that the sign was too small. It's those three points, and for the reasons that I stated in our brief, that we believe that the trial court's decision granting 615 and 619 dismissal of plaintiff's cause of action should be reversed and remanded for further proceedings at the trial court level. And I thank you for your time and your questions. Anne, did you say you had a question? I do not. You do not. Okay, thank you. You'll have an opportunity to make rebuttal. Thank you. Thank you. Mr. Dutton, you may proceed. Good morning, and thank you very much. My name is Ed Dutton. I represent the appellee of the Fox Valley Park District. And for a point of clarification, because we had a call from the clerk's office, there was only one appellee in this case. There are two defendants, but only one appellee. The co-defendant, which was the vehicle driver, is a defendant still in the trial court and is not part of the appeal. I just wanted to make that clear because there have been some questions. This is an interesting case to prepare for. And the reason why, as far as I'm concerned, is because plaintiff is putting the cart before the horse. I'm going to go back and talk about the pleadings for a minute because they're critical here. Now, Justice McClaren, you raised the point of whether we improperly, or I think plaintiff referred to as a hybrid motion, we brought a 2619.1 combined motion to dismiss. It had separately segregated, improperly captioned sections to the motion. The initial part of the motion was a 2615 motion relying solely upon the allegations in the complaint. And the purpose of that motion was to challenge the very theory of the plaintiff's cause of action, that the park district could be held liable if there were a restricted view at the intersection of the recreational trail and Densmore Road. So we cited five, six cases to the trial court, and we fully briefed those. And those cases were from this court and from the 4th District Appellate Court and from the owner of the Supreme Court in the Ziemba case. And all of those cases uniformly hold that a property owner such as the park district cannot be liable on a theory that there was a restricted view of crossing traffic at an intersection. So the trial court correctly ruled on that 2615 basis and granted that motion. As far as I'm concerned, the case begins and ends there. The reason why? The plaintiff just reconfirmed for you at the start of his argument that he appealed from three different rulings of the trial court that made up that motion to dismiss. But the plaintiff never contested the duty issue. The plaintiff conceded the duty issue, did not appeal the duty issue. If you look at page one of the plaintiff's reply briefing in this court, it was amazing to me. I read that page, and I thought I just heard him say that there was a sub-allegation that he claimed maybe I misunderstood or maybe I presumed the implication that the sub-allegation that there was a requirement would constitute reckless disregard or Will.1.1. Did I misunderstand? No, you heard him correctly. That is a separate issue. We also had a separate part of the motion on a 2615 basis dealing with the issue of willful and want conduct. That doesn't, again, I talked about the cart before the horse, that doesn't negate or in any way address the no legal duty issue. The trial court dismissed counts four and five of the Fifth Amendment complaint on the basis, I'm sorry, I think it was actually counts two and three, of the Fifth Amendment complaint on the basis that all of the allegations taken together pleaded a cause of action that the Park District had a legal duty to remove foliage and provide an unrestricted view. And the court followed this court's precedent in Pine v. Whitmer and the Supreme Court precedent in Ziemba and ruled correctly that there was, in fact, no such duty. As I said, it begins and ends there. If there's no legal duty, there's no reason to reach immunity. The Supreme Court has said that repeatedly in the Barnett case, in the Harriman case, in the Ardor case. The first issue the court must address is whether there's a legal duty. The reason why that becomes important here is because, again, the plaintiff did not appeal that issue. So I have cited Rule 341H7, which says, if the appellant does not raise a point, his weight cannot be raised in argument or in rehearing or in reply brief. So what does the plaintiff argue back? Again, I go back to my page one of the plaintiff's reply brief. The plaintiff says, well, aha, the Park District, as the appellee, is limited to the points raised in the appellant's brief. And we know that's not true. The appellee can raise any ground that's supported by the record in support of the trial court's holding below. And here, the trial court, it's not like the trial court never even considered it. The trial court fully considered that, noted that the plaintiff had not addressed the various cases on the no-duty issue, and dismissed the only two counts of the Fifth Amendment complaint directed against the Park District on that basis, and the plaintiff did not appeal. If that's not law of the case, I don't know what is. If we step away from that issue, again, I can talk as much as you want about Pine v. Whitmer and the Ziemba case, but my point is the trial court correctly followed those, ruled in the Park District's favor, did not accept out any allegations, but dismissed the Fifth Amendment complaint in its entirety against the Park District, and added the 304A finding. And the plaintiff did not appeal from that ruling. This appeal begins and ends there. The separate basis regarding Section 2615, also properly captioned, was that the allegations did not set forth a cause of action for willful and wanton misconduct, as that phrase is defined in Section 1-210 of the Tort Immunity Act. Again, that is a perfectly appropriate motion to bring. This Court confirmed that. I argued the Floyd v. Rockford Park District case here, and the Court confirmed it. It's not a hybrid motion. A defendant can properly bring a 2615 and a 2619, and on a 2615 basis can challenge allegations where the plaintiff says that's willful and wanton conduct, and the defendant can say, as a matter of law, that is not. The trial court, again, read all of the cases that we submitted. There were more than a dozen, and in each one of those cases, the review and courts ruled as a matter of law that the allegations did not rise to the level of willful and wanton misconduct. That is a completely appropriate ruling, and it is completely proper to make that ruling on the pleadings alone. So here the plaintiff was on the Fifth Amendment complaint. The initial complaint was filed just against the co-defendant driver. Then the plaintiff filed an amended complaint which added a number of other parties. I think it was the Village of Sugar Grove and some other entities, the Forest Park District of Kane County. They had nothing to do with the path. After those defendants showed that they had nothing to do with this path, the plaintiff dropped those defendants. The allegations against the Park District were made pretty much the same except where the plaintiff added an allegation that the size of the sign was, quote, too small without any substantive factual allegations, just the conclusion too small. What did the plaintiff allege against the Park District? That the Park District, and this all comes from the Fifth Amendment complaint, you can find it in pages C-500 to 503 for the critical allegations against the Park District. The plaintiff alleged the Park District had a recreational trail that would put up a yield sign, that would maintain the yield sign, that would maintain the path, that would regularly be inspected when we trimmed the path. Those are the allegations against the Park District. And so we challenged those allegations and we said, Plaintiff, what you have pleaded is that the Park District did a good thing. We had a recreational path. There's no allegation that the yield sign was in any way obstructed. No allegation that it was covered by foliage or that it was in a state of disrepair. Instead, the plaintiff simply alleged that we put up a yield sign at an intersection and that the decedent apparently disregarded the yield sign and rode in the oncoming traffic. Based upon those allegations, we cited more than a dozen cases. The plaintiff didn't address any of those, either in the trial court or in this court, notably. Those cases include, for example, Barr v. Cunningham, where the Supreme Court confirmed that, A, the question of willful and wanton conduct can be decided as a matter of law, and B, where the allegations, and in that case evidence, it was post-trial, showed that the defendant took certain steps that exercised a conscious regard, that showed a concern for and steps to avoid or minimize the risk of injury, even if the defendant didn't do everything possible in hindsight, that negated willful and wanton as a matter of law. I'm going to pull out for a second here, if I can, the Supreme Court's critical holding in Barr. I'm at paragraph 18 of that decision. This court has held that school employees who exercised some precautions to protect students from injury, even if those precautions were insufficient, were not guilty of willful and wanton conduct. And then the court goes through and notes, in that case, in the Barr case, where the teacher took various steps to minimize or avoid the risk of injury. But she didn't use goggles. The plaintiff alleged that the goggles in the nearby closet, she didn't use them. And the court said, that's fine. Let's focus on the things that the park district, or in that case, school district, did do, not on the things that they didn't do. The Supreme Court followed that up less than a year later with Cohen v. Chicago Park District, which is a premises defect case on a heavy-use bicycle trail. It's the Lakefront Bicycle Trail. It gets 70,000 users a year, I'm sorry, a day in the summer. And there, they had a known gaping defect that was four inches wide, four inches deep, and four feet long on the trail. And the park district, they didn't go out and mark it, and they didn't go out and repair it. What the park district did was, they put it on a list of what's called the Rapid Response Program. In other words, to be repaired at a later date. That's all they did. And the Supreme Court and Cohen said, you know what? The step that they took to identify the defect during an inspection, and they put it on a list of things to be repaired, that's enough to negate Wolf and Lewontin as a matter of law. And the trial court followed those decisions along with this court's holding in Floyd v. Rockford, which was my case, along with this court's holding in Callahan v. Clarendon Hills, which was my case. Those were all consistent holdings. In Callahan, this court ruled, as a matter of law on the pleadings, that where the park district had shoveled snow from the sidewalk, and it piled the snow next to the sidewalk, and the plaintiff said, you did a lousy job. You shoveled the sidewalk, yes, but you piled it next to the sidewalk, and it melted in the sand and then refroze back on the sidewalk. And the appellate court said, yes, but focus on the thing they did do. In hindsight, you can always see that they could have done extra steps, but what they did do was they shoveled the sidewalk, and that would have been, in conscious regard, as a step to minimize or avoid the risk of injury, and therefore, it's not Wolf and Lewontin. That does not break that decision. She did. And so, based upon that, the trial court issued two 615 rulings, which are completely in line with settlement case law and are correctly considered by the trial court on a 2615 basis based upon the allegations in the complaint. And the court ruled, one, no legal duty to provide an unrestricted view, which is the allegation in theory that pervades the plaintiff's complaint. Again, if you look through pages C500 to 503, you'll see the plaintiff's allegations, and that is the theory that pervades the plaintiff's allegations. And the trial court ruled, without exception, that there was no legal duty to do those things, and the plaintiff did not appeal from that reasoning or that ruling or that ground, and the plaintiff is therefore barred from doing that. The plaintiff noted in the reply brief that I had not filed a cross-appeal. I don't get to file a cross-appeal. We all know that. I prevailed in the trial court. Not only am I not allowed to file a cross-appeal, but on what basis would I? I completely agreed with the trial court. The trial court got it all right. I have no basis to appeal. So, I'm not limited by the arguments raised. I think if the trial court had ruled in favor of a plaintiff regarding your discretion argument, then maybe you would have had to file a cross-appeal if you wanted to raise that issue. That may have been if the trial court had ruled differently in opinion against me on the discretionary immunity issue. Or I may not have appealed it. I may have actually gone up on what I had argued at the outset here, and that is the prerequisite issue is whether we owed a legal duty, number one, and number two, whether the allegation stated a viable claim for Wolfman one conduct. If they don't, as I said at the outset, the case begins and ends there. We don't go on to discretionary immunity because there's no reason to. We don't reach immediately if there's no duty and or if the complaint does not state a viable cause of action. So, on the issue of the size of the sign, we've had arguments back and forth. The plaintiff said essentially that we didn't properly support our motion to dismiss on a 2619 basis because the affidavit of John Beer, our risk manager for the Park District, contained what the plaintiff refers to as guess and speculation. I do not believe that it is at all guess and speculation for a witness to give a reasoned estimate where they have a basis for that estimate as to height, weight, distance, or speed. It is routinely done. One of the cases that I was reviewing when I was getting ready for this was Harris v. Thompson, the Supreme Court's case from 2012, involving an intersection collision of an ambulance and a motor vehicle. And the Supreme Court completely considered the conflicting testimony of the vehicle driver of the ambulance, which said he thought he was going about 10 miles an hour. That was his estimate. That was the word he used. And the front seat passenger in the colliding vehicle, which said that her estimate was the ambulance was going 40. It goes to weight, but not admissibility. Those are both completely proper. I believe the distance between the front of this podium and that and the front of the court's bench is around 6 feet. I don't know if it's 6 feet or not, but I have a reasoned estimate for it because I can observe it, and I'm about 6 feet 2, and I think if I lay it down, I'd about reach it. So I'm going to guess it's about 6 feet. Does that make it a factual question? It makes it a factual point that's admissible in evidence. The plaintiff then can come back. That's the important point of that. The burden then shifts to the plaintiff. If the plaintiff has conflicting facts, conflicting estimates, conflicting measurements, bring them by all means, and that would create a question of fact. But the plaintiff didn't do so. The plaintiff didn't even put a factual allegation in the complaint. The complaint simply says the sign was too small. And when Justice McLaren asked about the history of the pleadings, that allegation came in response to our affidavit where John Beer's affidavit went on file, which said I went out, looked at the sign, measured a similar sign in the sign bin, and based upon the photographs, my observation, and my measurement of the smallest yield sign I could find in the sign bin, it was 18 by 18 by 18, which met the minimum requirements for a shared use path. Is the missing link in the chain, though, whether that sign that he measured in the cage was the sign that was at the scene? It doesn't have to be. I don't believe that's a missing link, Your Honor. What I believe is it's a similar sign. We have many instances where the physical evidence is actually destroyed. It no longer exists. But somebody can take a similar piece of whatever it happens to be item and measure it and say, you know what? I looked in the photographs and that appears to be similar to me. We have testimony all the time in auto accident cases where somebody says I estimated the length of the skid marks as being over 25 feet. The skid marks may no longer exist by the time we get to trial. The skid marks may have been cleaned up. They may have washed away. It doesn't prevent the witness from being able to testify if they have personal observation. Does your client make their own signs or do they buy them? It's not on the record, but they buy them. Our client does not have a sign shop. I'm not aware of any partnership that does actually. I'm switching over then to discretionary immunity issue because I'm going to be running out of time here. Well, your time is up unless there are any other questions. Thank you very much. I appreciate it. Mr. Stevens, you may proceed. Thank you. I will start with my colleague's arguments about the duty to provide an adequate view. As we stated in our reply brief, at this point in litigation, there is nothing that indicates that the Park District did have an affirmative duty to provide an adequate view by removing foliage at the subject intersection. However, the analysis doesn't start and stop there because there is a duty under the manual to see, to analyze whether or not there is a restricted view or not. Our sub-allegation that's at the heart of the discretionary immunity question is whether or not they analyzed. But his point is we don't even get to that. That is not even relevant until there is a duty. The duty is based off of the manual's requirements. It seems that you're bootstrapping off the same issue twice. So there's an independent duty that is recognized by our court as generally not being upheld as a legal duty, which is a requirement to provide adequate views at intersections like these. However, there's a separate duty provided by the manual, which requires municipalities like the Park District, when placing a sign, to analyze whether a restricted view exists or not. And that is in the manual at 9B.03. So these are separate duties. We agree that at this point there's nothing that says they had to trim the foliage at this intersection. However, our complaint sets forth that they were required ministerially by the manual to look whether or not that restricted view existed or not. And based off of that determination, that dictates which sign they placed there. So I disagree that it starts and stops there, because I think they're two separate tracks. Briefly, my colleague spoke about Wilflin-Watt misconduct and cited the Barr v. Cunningham case, which, as he pointed out, was a post-trial motion after a jury trial. And the Barr v. Go ahead. Well, the statements that you've made seem to me, at least, that what you're saying is that the breach of a ministerial function is Wilflin-Watt, or at least arguably Wilflin-Watt. That's correct. And if we determine that the failure to carry out a ministerial function is not Wilflin-Watt, for whatever reason, then would you agree that discretion is by the boards, and we agree with Mr. Dutton? I don't. I think that that's a layered question that requires a layered answer. The discretionary immunity doesn't I'll repeat my question. Sure, I'm sorry. And I'll parse it. It's your contention that the breach of a ministerial function or duty is Wilflin-Watt? In this case, yes. If we disagree with you, then do we affirm without even discussing the question of discretion? In the procedural context, if that were your decision, it would stop at 615, and there's no reason to go on to the 619 analysis. But with the Barr v. Cunningham case of the cited and the post-trial motion after a jury trial, which relied on the Supreme Court's decision in Murray, Murray is the case that says that Wilflin-Watt as an allegation is a matter to be determined by a jury. And Murray says that courts are reluctant to decide at all, but especially Wilflin-Watt misconduct, before evidence is complete. The case that we have here is much more similar to the procedural posture in Murray as it was to Barr. And from a pleading standpoint where everything is taken in favor of the non-movement, we've stated that the park district consciously disregarded a manual that's made at least in part for safety when implementing a sign at this intersection. The other point that I want to address is that the sign was too small. It isn't that blanketed of an allegation. In the Fifth Amendment complaint, we specifically state that the sign was too small in light of the requirements of Part 9B-1 of the manual. You said light? In the light of. Oh. Sorry. Okay. In the context of. Yes. So it's not just that the sign is too small. White or pink instead of blue or yellow. No, that's not a part of one of our subs. But we specifically state that it's too small in the context of 9B-1, which puts forth specific mandatory minimum dimensions. You can finish. Thank you. It's true that eyewitnesses can analyze the speed of vehicles. However, this is two steps removed from that. This is John Beer taking a sign that is not the sign at issue and saying that he thinks that this sign is similar to that sign. That's two steps removed from what an eyewitness could otherwise do with a vehicle. And it is not just plaintiffs calling the affidavit guess or speculation. John Beer, in his deposition himself, calls this an estimate, which a small case says is improper. Thank you very much. Thank you. If there's another case on the call, there will be a short recess.